# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### STATESBORO DIVISION

JUSTIN S. ASHLEY,                )
                                 )
                    Plaintiff,   )
                                 )
v.                               )                CV621-083
                                 )
WYNITA SHARPE, *et al.*,         )
                                 )
                    Defendants.  )

## ORDER AND REPORT AND RECOMMENDATION

Proceeding *pro se* and *in forma pauperis*, plaintiff Justin S. Ashley filed this 42 U.S.C. § 1983 Complaint related to an altercation that occurred at Georgia State Prison in Reidsville, Georgia and its aftermath. *See generally* doc. 1.  He was authorized to proceed *in forma pauperis*, doc. 5, and, after an extension of time, doc. 7, he returned the required forms.  *See* docs. 9 & 10.  After the Court found his original Complaint failed to state a claim, he was directed to file an amended pleading.  *See* doc. 19 at 1-2.  He complied.  Doc. 27.  The Court has screened his Amended Complaint, and for the reasons below, recommends that it be dismissed.  *See* 28 U.S.C. § 1915A.

1

## I.     Factual and Procedural Background

The Court previously recommended that Ashley's Complaint be dismissed because Ashely failed to plead any claim upon which relief could be granted.  Doc. 14.  Ashley objected and expanded upon his original Complaint.  *See* doc. 15; *see also* doc. 1 (original Complaint).  He appeared to additionally allege that the Defendants "interfered with [his] access to courts."  Doc. 18 at 5.  The Court thus vacated its prior Report and Recommendation ("R&R") and ordered Ashley to file an amended complaint containing all of his allegations.  Doc. 19 at 2.  Ashley has done so, but a comparison of his pleadings reveals that the Amended Complaint does not substantively differ in any meaningful manner from his original Complaint, and therefore does not correct the deficiencies already identified or include any new claims.  *Compare* docs. 1, 1-1 *with* doc. 27.

The factual allegations in Ashley's original Complaint occupied approximately 48 pages.  *See* doc. 1 at 6-39; doc. 1-1 at 1-14.  They are described in this Court's now-vacated R&R, doc. 14.  Without exhaustively recounting the factual allegations, they present a narrative of the events leading up to an altercation involving Ashley and other

inmates that occurred on August 9, 2019, the altercation itself, and then Ashley's experience with medical treatment thereafter.  *See* doc. 1 at 6-29.   Ashley described how the cell block lacked supervision and maintenance, and how an altercation between himself and other inmates was, in Ashley's mind, imminent and unavoidable.   Doc. 1 at 14-22.  Ashley stated that he requested to be housed in a different cell in a different section of the dormitory or placed in another dormitory because he had "recent altercations" with certain inmates who were either housed in the same section of the dorm as himself or were orderlies who were assigned to work in his cell.  Doc. 1 at 7.

Ashley alleged that an actual physical altercation began after several days of tactical provocation from other inmates,  when he "yanked open his jumpsuit and removed the two weapons he had concealed on his waist and he attacked the inmate who was sitting on the box attached to the door of cell #2 and who was just a few feet from him because he felt 'boxed-in' with nowhere to run for safety."  *Id.* at 29.   After Ashley "initiated his defensive attack," and "struck the inmate with a glancing blow," the inmate fled and Ashley "[gave] chase . . . ."  *Id.* at 29-30.  Ashley then "spun around" to confront another inmate and "rushed towards"

that inmate, who "retreated even though he had a shank in his hand." *Id.* at 30. To be clear, Ashley never alleged that his opponents made affirmative offensive moves, but only that he perceived them to be provoking his paranoia, and that, had the inmates been properly supervised, he would not have needed to act in preemptory "self-defense." Doc. 1 at 17-39.

Though not immediately, corrections officers quelled the fight. Doc. 1 at 31-36. Ashley was injured and was immediately escorted to the medical department where he was initially treated. *Id.* at 36-37. Ashley was taken to the hospital, treated, and then transferred by ambulance to a second hospital, Memorial Health University Medical Center in Savannah, Georgia. *Id.* at 37-38. He underwent surgery, "had various diagnostic medical testing procedures performed on him," had his broken arm placed in a splint, and received stiches for the wounds on his back and the laceration to his head. *Id.* at 38. He remained in the hospital for four days and was discharged on August 13, 2019. *Id.* Upon discharge, he was "put on some ineffective medications that did nothing to allev[iate]" his pain. *Id.* at 38. He was also told that he would be "seen

by medical staff on a daily basis to take care of his bandages and wounds for the next week . . . ." *Id*. at 39.

After his treatment, Ashley was "put on 'involuntary administrative segregation—Tier II.'" *Id*. at 39. The allegedly illegitimate segregation, he contended, violated his Fourteenth Amendment due process rights, his Eight Amendment rights, "due to the living conditions," and his First Amendment "right to access the courts." Doc. 1-1 at 1-2. Finally, Ashley alleged continued deprivation of medical care regarding his left arm, doc. 1-1 at 12, and that, although he has made sick calls, they were not answered. *Id*. at 13. However, he did speak to a "Doctor Jane Doe . . . on multiple occasions . . . ," who told him that "she would not arrange for him to have surgery and/or therapy . . . . and that the only medications besides moltraine [sic] and regular Tylenol that he would receive for his pain . . . was the medication that she had already prescribed him even though those medications did not help him . . . ." *Id*. at 13.

After the Court ordered Ashley to amend his Complaint, he restated this account, verbatim. Doc. 27 at 14-74.[1] However, Ashley's new filing

_____

[1] There appears to be a divergence in that Ashley specifically identified the

was modified to include additional footnotes, all added to the end of the document, which provide the Court with more details regarding Ashley's perceived need for defensive tactics.  *See* doc. 27 at 80-91.  For example, Ashley notes that Tier II was both a housing unit for the mentally ill who were "dangerous, high-risk inmates," as well as those who needed protective custody.  *Id.* at 80.  He alerts the Court that he is himself is a "severely mentally ill and mentally disabled person suffering the effects of 'unspecified schizophrenic spectrum, psychotic disorder, anxiety (panic attacks), and Post Traumatic Stress Disorder, the symptoms of which . . . include but are not limited to: hyper-vigilance, perceptual disturbances, and paranoid ideation."  *Id.*  He notes that GSP "was host to an alarming rate and amount of inmate assaults," which he claims occurred when correctional staff, who largely neglected policy, had abandoned their post.  *Id.* at 81.

He claims he had a generalized fear of being targeted by gangs and that he communicated to Defendant Sharpe that he already engaged in three altercations with gang members, and that he was denied protective

---

Defendants and the distinct claims against them on page 5 of his Amended Complaint.  As well, his Amended Complaint contained every page of Form Pro Se 14, whereas this portion of his original Complaint appears to have been shorter.  Also, it appears that the pages are not in order.  *See* doc. 27 at 62-75.

custody anyway.  Doc. 27 at 81-82.  However, "[o]f the two inmates whom plaintiff informed Defendant Sharpe that he had-had prior physical altercations . . . one of the altercations is of no consequence because the inmate was not later physically involved in the inmate-on-inmate assault" giving rise to his Amended Complaint.  *Id.* at 82.  Nevertheless, Ashley argues that the prior altercations with other individuals "set the tone" because one of the inmates had executed a "sneak attack" on Plaintiff, so he was leery of another.  *Id.*  Ashley complains that the other inmates' pre-altercation behavior was specifically designed to and effectively did "trigger" the symptoms of his mental illness, *id.* at 83-84, and he further identifies the inmates who he attacked by noting whether they were involved in previous incidents.  *Id.*  He identifies the style of shanks used, *id.* at 84, defends his actions as symptoms of his mental illness or the results of intentional provocation from other inmates, *id.* at 85 & 88-89, describes the logistical tactics of his would-be attackers, *id.*; *see also id.* at 87, provides more detail about each inmate's prior actions, *id.* at 86, and he attached a map of the area where the incident occurred, *id.* at 91.  It does not appear that the substantive claims made in Ashley's

original Complaint are altered by the details provided in the Amended

Complaint. *Compare* docs. 1, 1-1 *with* doc. 27.

## II.   Legal Standard

Under the Prison Litigation Reform Act (PLRA), a federal court is

required to conduct an initial screening of all prisoner complaints.  28

U.S.C. § 1915A(a).  Because Ashley's Amended Complaint superseded his

first one, the Court must conduct its screening of the Amended

Complaint.  As previously noted by the Court, in conducting the review,

the Court must identify all "cognizable claims" and dismiss the

complaint, or any portion thereof, that is "(1) is frivolous, malicious, or

fails to state a claim upon which relief may be granted; or (2) seeks

monetary relief from a defendant who is immune from such relief."  28

U.S.C. § 1915A(b).  The complaints of unrepresented parties are held to

a less stringent standard than those drafted by an attorney and are

afforded a liberal construction, *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)

("a *pro se* complaint, however inartfully pleaded, must be held to less

stringent standards than formal pleadings drafted by lawyers (internal

quotations omitted)); however, they must still comply with procedural requirements, *McNeil v. United States*, 508 U.S. 106, 113 (1993).

To state a claim, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). A plaintiff . . . must plead facts sufficient to show that [his] claim has substantive plausibility" and to inform the defendant of "the factual basis" for the complaint. *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014). The complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not" suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In its review, the Court also applies the Federal Rule of Civil Procedure 12(b)(6) standard, *Leal v. Ga. Dep't of Corr.*, 254 F.3d 1276, 1278–79 (11th Cir. 2001), accepting all allegations as true and construing them in the light most favorable to the plaintiff. *Bumpus v. Watts*, 448 F. App'x 3, 4 n.1 (11th Cir. 2011).

### III.  Discussion

The Court has reviewed and considered Ashley's Amended Complaint, and, while he has better explained the reasons why he perceived that a preemptory attack would be lifesaving, he has not

alleged a constitutional violation against the officials involved in this lawsuit. Therefore, the Court restates its prior findings, while acknowledging the additional context provided by Ashley.

### A. Violations of Administrative Procedures

Ashley's Amended Complaint again includes numerous references to Georgia Department of Corrections' Standard Operating Procedures. *See, e.g.,* doc. 27 at 40, 47. Although he alleges violations of those procedures, he does not appear to assert any claim to relief based on those violations, at least directly. *See id.* at 62; *but see id.* at 62 (mentioning procedures in "grounds for relief.") To the extent that he intends to assert such a claim, it would fail. As this Court has explained, "[a]n allegation of non-compliance with a prison regulation by prison officials is not, in itself, sufficient to give rise to a claim upon which relief may be granted." *Morales-Vega v. Walker*, 2018 WL 4039727, at *3 (S.D. Ga. June 25, 2018); *see also Cook-Bey v. Luckie*, 2019 WL 2866052, at *5-6 (M.D. Ala. June 11, 2019) ("A violation of departmental rules of policies, standing alone, does not infringe upon an inmate's constitutional rights," and collecting cases). Accordingly, to the extent that he intended to assert any such claim, it should be **DISMISSED**.

### B. Failure to Protect

Ashley alleges that officials failed to protect him. *See, e.g.,* doc. 27 at 22-39; 62-63, 70, 73. "[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quotes and cites omitted). "It is not, however, every injury suffered by one inmate at the hands of another that translates into a constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. Merely negligent failure to protect an inmate from attack does not justify liability under § 1983. *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990). "Prison officials must have been deliberately indifferent to a known danger before we can say that their failure to intervene offended 'evolving standards of decency,' thereby rising to the level of a constitutional tort." *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)).

The most obvious problem with Ashley's claim that officials failed to protect him is that he instigated the fight. To be sure, he spends considerable time in his Amended Complaint alleging that he had reasons, which seemed sufficient to him, *see* doc. 27 at 22-45, 80-90, to "initiate[ ] his defensive attack," *id.* at 37. The fact remains, however,

11

that no violence occurred until he "yanked open his jumpsuit and removed the two weapons he concealed on his waist and *he attacked*" the other inmate. *Id.* (emphasis added).  Given those clear allegations, any failure-to-protect claim is doomed, notwithstanding the additional context provided in Ashley's footnotes. *See, e.g., Clark v. Johnson*, 181 F. App'x 606, 607 (7th Cir. 2006) ("[P]rison officials cannot reasonably be required to protect an inmate who intentionally instigates a violent altercation with another prisoner," even where other inmate provoked the altercation); *Buckman v. Halsey*, 2020 WL 5076695, at *5 (M.D. Fla. Aug. 26, 2020) ("Plaintiff cannot prove a failure-to-protect claim against Defendant when Plaintiff was the one who physically advanced toward Ash" and collecting cases); *Lemmons v. Durant*, 2011 WL 4633104, at *3 (C.D. Ill. Oct. 4, 2011) ("[S]tarting a fight or voluntarily participating in one and then getting the worst of it does not create a failure to protect claim.").   To the extent Ashley asserts a failure-to-protect claim, therefore, it should be **DISMISSED**.

## C. Deliberate Indifference to Serious Medical Needs

Ashley also claims that defendants were deliberately indifferent to his serious medical needs, both related to the immediate treatment for

the wounds he suffered in the fight, and related to the care he currently receives for the lingering effects of those wounds, specifically the treatment he receives for ongoing pain. Doc. 27 at 45-47, 59-61, 79. He does not state a claim related to either the acute care or the ongoing pain management.

Although a "prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society*," Brown v. Plata*, 563 U.S. 493, 511 (2011), "[n]ot every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment," *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (quotes and cite omitted). A denial-of-adequate-medical-care claim requires a showing of "deliberate indifference to serious medical needs of prisoners." *Estelle*, 429 U.S. at 104. Plaintiff must allege that (1) he suffered a sufficiently serious medical need; (2) to which the defendant was deliberately indifferent; (3) resulting in an injury. *Goebert v. Lee Cty.,* 510 F.3d 1312, 1326 (11th Cir. 2007).

A prisoner's mere disagreement with the type of medical treatment he receives is insufficient to support a claim that prison officials have

denied him adequate medical care.  *See, e.g., Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) ("Although [plaintiff/inmate] may have desired different modes of treatment, the care the jail provided did not amount to deliberate indifference."); *see also Estelle,* 429 U.S. at 107 ("the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment.  A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.").   Even if the treatment an inmate receives is negligent, that's not enough to support a § 1983 claim.  *See, e.g. Harris*, 941 F.2d at 1505 (citing *Estelle*, 429 U.S. at 106) ("Mere incidents of [medical] negligence or malpractice do not rise to the level of constitutional violations.").

To the extent that Ashley asserts any claim that the treatment he received immediately after the altercation was inadequate, *see* doc. 27 at 45-47, and, even considering his footnotes, it is not clear that he does, *see, e.g., id.* at 79, his allegations make clear that he was provided care, even if he contends it was somehow defective.  And, though he clearly asserts a claim based on defendant "Doctor Jane Doe's" refusal to "arrange for him to have surgery and/or therapy to correct his deformity and

immobilization," doc. 27 at 60, 79, it fails.  To the extent that Ashley asserts a claim that any defendant was deliberately indifferent to the injuries he suffered in the fight, based on his disagreement with the doctors' refusal to provide surgery,[2] his claim should be **DISMISSED**.

Ashley's explicit denial-of-care claim relates specifically to the ongoing treatment he receives for his pain, allegedly caused by "nerve damage."  *See* doc. 27 at 59-61, 79.  "Severe pain that is not promptly or adequately treated can . . . constitute a serious medical need depending on the circumstances."  *Melton v. Abston*, 841 F.3d 1207, 1222 (11th Cir. 2016), *abrogation on other grounds recognized by Campoverde-Panora v. United States Attorney Gen.*, 2021 WL 5414940, at *2 (11th Cir. Nov. 19, 2021).  However, Ashley expressly alleges that "Doctor Jane Doe" is not refusing to treat his pain, she is simply refusing to change the treatment she has prescribed for his pain.  *See* doc. 27 at 60 (alleging that the doctor "informed him that the only medications besides motraine [sic] and regular Tylenol that he would receive for his pain and nerve damage *was the medication that she had already prescribed him*" (emphasis added)).

---

[2]  *Cf. Johnson v. Whitman*, 2015 WL 3385153, at *5-6 (N.D. Ala. May 26, 2015) (dismissing a deliberate indifference claim based on doctor's "refusal to approve surgery to reset the poorly healed break in [plaintiff's] wrist," as an "attempt to turn an issue of medical judgment into grounds for an Eighth Amendment violation.")

A prisoner's dissatisfaction with the efficacy of pain medication is simply not sufficient to state a deliberate indifference claim. *See Baez v. Rogers*, 522 F. App'x 819, 820-21 (11th Cir. 2013) (affirming dismissal of deliberate indifference claim based on allegations that pain medication was inadequate because it "alleges only a difference of medical opinion as to what course of treatment was appropriate."); *Smith v. Wood*, 2019 WL 13068185, at *7 (N.D. Ga. Oct. 31, 2019) (collecting cases), *adopted* 2020 WL 11424888 (N.D. Ga. July 15, 2020).  Accordingly, Ashley's claim that defendant "Doctor Jane Doe" has been deliberately indifferent to his pain should be **DISMISSED**.

### D. Due Process

Ashley's allegations also plausibly implicate a claim that his due process rights were violated when he was "assigned . . . to Tier II without having any proper legal basis . . . ." *See* doc. 27 at 48. *But see id.* at 92. (omitting any requested relief for an alleged due process violation).  A liberty interest in avoiding segregated confinement may exist where the conditions of the segregation are an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life . . . ." *Quintanilla v. Bryson*, 730 F. App'x 738, 743 (11th Cir. 2018) (quoting

*Sandin v. Conner*, 515 U.S. 472, 484 (1995)); *Turner v. Warden, GDCP*, 650 F. App'x 695, 700 (11th Cir. 2016); *Wallace v. Hamrick*, 229 F. App'x 827, 830 (11th Cir. 2007) (noting the "touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is . . . the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.' " (quoting *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005)). "Confinement to administrative segregation, under conditions substantially similar to those experienced by the general population of the prison," however, "does not implicate liberty interests. . . ." *Al-Amin v. Donald*, 165 F. App'x 733, 738 (11th Cir. 2006).

Ashley's Complaint fails to allege any conditions that are sufficient to implicate his liberty interest.   His allegations concerning the conditions applicable on Tier II assignment are wholly conclusory.   He refers to, but does not explain, "the living conditions he would be [and] was in fact subjected to while assigned to dorm K-1 and the Administrative Segregation—Tier II program . . . ."   Doc. 27 at 48-49.   He also refers broadly to a deprivation of his "right to access the courts for redress of governmental grievances . . . ."   *Id.* at 49.   There are no

additional factual assertions contained in Ashley's footnotes further substantiating this claim. Therefore, the Court's prior finding that "[s]uch conclusory allegations are insufficient to support his claim" stands. Doc. 14 at 14 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) ("the allegations are conclusory and not entitled to be assumed true.")). In the absence of any factual allegations that "the conditions of administrative segregation impose an atypical and significant hardship . . . relative to the ordinary incidents of prison life," Ashley's due process claim should be **DISMISSED**. *See, e.g., Pierce v. Prison*, 2017 WL 125041, at *4-5 (S.D. Ga. Jan. 12, 2017).

## IV. Conclusion

In summary, even considering his amendment, Ashley has not pleaded any claim upon which relief can be granted. *See* 28 U.S.C. § 1915A. The alleged violations of standard operating procedures do not state a claim. The facts he has alleged are inconsistent with a viable failure-to-protect claim. His allegations concerning his medical treatment show that he has not been denied care; he merely disagrees with the type of care he has been provided. Finally, to the extent that he contends that his due process rights were violated when he was placed in

administrative segregation, he has not alleged any fact that would support the liberty interest essential to such a claim. His Amended Complaint, therefore, should be **DISMISSED**.[3] Additionally, to the extent the Court's prior directive dismissing Ashley's motions for "limited discovery" and his inquiry about the "status" of this case were vacated by the Court's prior Order vacating the R&R, doc, 19, those Motions continue to be moot and therefore remain dismissed. Docs. 12 & 13.

Meanwhile, it is time for plaintiff to pay his filing fee. His PLRA paperwork reflects $0.00 in average monthly deposits and a $0.00 average reserved monthly balance over the six-month period prior to the date of his Prison Account Statement. Doc. 8. He, therefore, owes no initial partial filing fee at this time. *See* 28 U.S.C. § 1915(b)(1) (requiring an initial fee assessment "when funds exist," under a specific 20 percent formula). Plaintiff's custodian (or designee) shall further set aside 20 percent of all future deposits to his account, then forward those funds to the Clerk each time the set aside amount reaches $10.00, until the

---

[3] A *pro se* prisoner normally should be given an opportunity to amend his complaint at least once, *see, e.g., Johnson v. Boyd*, 568 F. App'x 719, 724 (11th Cir. 2014), and Ashley has had this opportunity. "[A] district court need not allow amendment if the amended complaint would still be subject to dismissal," *Jenkins v. Walker*, 620 F. App'x 709, 711 (11th Cir. 2015). Ashley's claims do not appear amendable despite his providing more details.

balance of the Court's $350.00 filing fee has been paid in full.  In the event that plaintiff is transferred to another facility, his present custodian shall forward a copy of this Order and all financial information concerning payment of the filing fee and costs in this case to his new custodian.  The balance due from plaintiff shall be collected by the custodian at all future facilities in accordance with the terms of this Order.  The payment portion of this Order is to be implemented immediately, as it is not subject to the adoption provision of Fed. R. Civ. P. 72(b).

This report and recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3.  Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties.  The document should be captioned "Objections to Magistrate Judge's Report and Recommendations."  Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge.  The district judge will review the magistrate judge's findings and

recommendation pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to timely file objections will result in the waiver of rights on appeal.  11th Cir. R. 3-1; *see Symonette v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO ORDERED AND REPORTED AND RECOMMENDED**, this 5th day of April, 2024.

_____
CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA